# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**BARBARA JUSTINE KING,**

       **Plaintiff,**

**v.**                                          **Case No.: 1:19-cv-00738**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 13, 14, 15).

For the following reasons, the undersigned **RECOMMENDS** that the Court

**GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    Procedural History

In May 2016, Plaintiff Barbara Justine King ("Claimant") filed applications for DIB and SSI, alleging a disability onset date of October 1, 2011 due to anxiety, bi-polar disorder, depression, paranoid schizophrenia, and learning problems. (Tr. at 216-29, 258). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 13). Thus, Claimant requested an administrative hearing on her applications for benefits, which was held on July 30, 2018 before the Honorable Nathan Brown, Administrative Law Judge (the "ALJ"). (Tr. at 29-63). By written decision dated October 25, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 13-23). The ALJ's decision became the final decision of the Commissioner on August 13, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support, and the Commissioner filed a Brief in Support of Defendant's

Decision. (ECF Nos. 13, 14, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 24 years old on her alleged onset date and 31 years old on the date of the ALJ's decision. (Tr. at 21). She completed high school, attended one and one-half years of undergraduate studies, and previously worked as an accounting clerk in the United States National Guard, fast food worker, and housekeeper. (Tr. at 39, 57).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1

3

to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results

to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

5

decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2014. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 1, 2011, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: schizoaffective disorder and panic disorder with agoraphobia. (*Id.*, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-18, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds. The claimant can perform simple work and to make simple, work-related decisions. The claimant can never work at unprotected heights but can work with moving mechanical parts occasionally and in moderate noise. The claimant can interact with supervisors and coworkers occasionally, but never interact with the public except for incidental contact. She can work around others but should work more off by herself. The claimant can work in a low-stress environment defined as: only occasional decision-making required, only occasional changes in the work setting, and no fast-paced production requirements.

(Tr. at 18-21, Finding No. 5).

At the fourth step, the ALJ determined that Claimant did not have any past relevant work. (Tr. at 21, Finding No. 6). Therefore, the ALJ reviewed Claimant's work experience, age, and education in combination with Claimant's RFC to determine her

6

ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7 through 10). The ALJ considered that Claimant was born in 1987 and was defined as a younger individual on the alleged disability onset date, and Claimant had at least a high school education and could communicate in English. (Tr. at 21, Finding Nos. 7 through 8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as an auto detailer, cleaner, non-postal mail clerk, or folder. (Tr. at 21-22, Finding No. 9). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act. (Tr. at 22, Finding No. 10).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant asserts three challenges to the Commissioner's decision. First, she argues that the ALJ misconstrued a statement that her clinical therapist, Candice Brackins,[1] repeated several times in her clinical notes regarding her functional limitations and improperly relied upon that interpretation to support his credibility analysis and RFC assessment. (ECF No. 14 at 16-18).  In her second argument, Claimant contends that the ALJ's credibility analysis is further unsupported by substantial evidence because the ALJ failed to consider her four in-patient psychiatric hospitalizations. (*Id.* at 19-20). Finally, in her third challenge to the Commissioner's decision, Claimant asserts that the ALJ did not discuss the functional impact of her agoraphobia or assess RFC limitations related to it. (*Id.* at 20).

---

[1] This provider's surname became Woods during Claimant's treatment, but the undersigned refers to her as Ms. Brackins throughout this PF&R to avoid confusion because the ALJ identified her as Ms. Brackins in his decision. (Tr. at 20).

In response to Claimant's challenges, the Commissioner argues that the ALJ's interpretation of Ms. Brackins' statements was reasonable, and, where there are two reasonable interpretations of a piece of evidence, one of which belongs to the ALJ, it is not the Court's role to choose between them. (ECF No. 15 at 14-15). Furthermore, the Commissioner contends that, even if the ALJ was wrong, any such error was harmless based on the other evidence in the record. (*Id.* at 15). Regarding Claimant's hospitalizations, the Commissioner states that the ALJ acknowledged Claimant's intermittent setbacks, but noted that they resolved, and the ALJ also considered the opinion evidence and other evidence in assessing Claimant's credibility. (*Id.* at 16). Finally, as to Claimant's contention that the ALJ did not consider her agoraphobia, the Commissioner asserts that the ALJ considered all of the evidence and assessed significant restrictions that accounted for all of Claimant's mental conditions, including limited contact with other people. (*Id.* at 17).

## V.   **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. *Treatment Records*

On November 21, 2011, Claimant was evaluated by Staci Craft, PA-C, in the Crisis Stabilization Unit ("CSU") at Southern Highlands Community Mental Health Center ("Southern Highlands"). (Tr. at 442). She reported a long history of "twitching," but stated that she recently started having panic attacks. (*Id.*). On examination, Claimant displayed fleeting eye contact, psychomotor agitation, depressed mood, flat affect, monotone and somewhat pressured speech, and limited insight/judgment; she also

reported auditory hallucinations, paranoia, and intermittent suicidal and homicidal ideations; and she appeared withdrawn, guarded, and twitching. (Tr. at 445-46). However, Claimant did not have any flight of ideas or loosening of associations, and her cognition was alert. She was fully oriented, her memory was intact, her attention was fair, and she had average intelligence. (*Id*.). PA-C Craft diagnosed Claimant with bipolar schizoaffective disorder and anxiety disorder not otherwise specified. (Tr. at 446). She prescribed Vistaril and Geodon. (*Id*.). Claimant was voluntarily admitted for in-patient treatment for seven days. (Tr. at 332).

Claimant moved to California in 2013 where she began seeing clinical therapist, Ms. Brackins. On June 7, 2013, Ms. Brackins recorded that Claimant was  fully oriented but had unkempt hair and exhibited nervous and rocking behavior. (Tr. at 337). Claimant's speech was confused; she required repetition and inquiry for clarification; and she had tangential thought processes; decreased focus and attention; grandiose and other abnormal thoughts; poor/fair insight and judgment; and anxious and hypervigilant mood with congruent affect. (*Id*.). She told Ms. Brackins that she could not recall events before the age of 11 and heard four voices inside of her head. (*Id*.).

Claimant followed up with Ms. Brackins again on July 23, 2013. Claimant stated that she had thoughts of wanting to physically assault individuals in the lobby before her appointment, and she expressed an urge to consume human flesh. (Tr. at 330). She said that she had difficulty grooming herself and managing her daily hygiene due to her mental illness. (*Id*.). On examination, Claimant's mood was depressed; her affect was flat; her insight and judgment were poor to fair; she reported depersonalization/obsessions/compulsions and auditory/visual hallucinations, stating

that there were four different individuals present in her mind that spoke to her. (Tr. at 333). Her thought processes were tangential, overly detailed, and hard to follow, and she was distractible and unable to remember events before the age of 11 years old. (*Id.*). However, Claimant was fully oriented, talkative, and had average intelligence. (*Id.*).

On August 21, 2013, Ms. Brackins recorded that Claimant failed to appear for her monthly appointment and her present status was unknown. (Tr. at 324-25). She noted that Claimant was receiving services for suicidal and homicidal ideation, auditory and visual hallucinations, and paranoia. (Tr. at 324). Ms. Brackins listed Claimant's diagnosis as paranoid schizophrenia, stating, "Ct negative symptoms interfere with Ct ability to ability to [sic] function at home, work, and community." (*Id.*). Ms. Brackins documented that she left Claimant a voicemail message and mailed her a letter to determine whether Claimant was receptive to continued therapy. (Tr. at 324). She stated that therapy would be discontinued if Claimant did not respond within ten days. (*Id.*).

Claimant spoke to Ms. Brackins the following day. Claimant said that her mood was depressed, but she felt hopeful about managing her mood after receiving needed medication assistance and moving out of her mother's home. (Tr. at 323). Claimant stated that she had continued conflict with her mother and had the urge to hit her mother, but she restrained herself. (*Id.*). She was cooperative with Ms. Brackins and appeared motivated toward treatment. (*Id.*).

Ms. Brackins spoke with Claimant again on August 28, 2013. Claimant reported feeling pleasant and not having any suicidal or homicidal ideation. (Tr. at 322). She was cooperative with Ms. Brackins, receptive toward the therapeutic process, and appeared motivated to utilize medication and mental health support services to manage her

symptoms. (*Id.*).

The following day, on August 29, 2013, psychiatrist, Jeremiah Umakanthan, M.D., examined Claimant. Her mood/affect was anxious, and her insight and judgment were poor, but her appearance/hygiene, behavior, speech, perceptual process, thought process, thought content, memory, and orientation were within normal limits. (Tr. at 329). Dr. Umakanthan prescribed medication. (*Id.*).

On September 9, 2013, Ms. Brackins called Claimant for a status update and to schedule a therapy appointment. Claimant reported feeling anxious about completing needed tasks. (Tr. at 321). However, Claimant had moved out of her mother's home and was now residing with a friend. (*Id.*). She said that her new living situation reduced her anxiety. (*Id.*). She expressed that she would like to return to group therapy, and she was encouraged to discuss it with Ms. Brackins once she was compliant with her psychiatric medications. (*Id.*). However, on September 23, 2013, Ms. Brackins noted that Claimant again failed to appear for her monthly therapy session. (Tr. at 319). She sent Claimant a letter of interest, but Claimant did not respond, and Ms. Brackins discontinued treatment on October 7, 2013. (Tr. at 318).

Claimant moved back to West Virginia in February 2016. (Tr. at 373). She was again referred to Southern Highlands, this time after she "became panicky" and "nearly had a panic attack" during WorkForce West Virginia orientation. (Tr. at 372). Social Worker, Tom Kersey, evaluated Claimant on April 6, 2016. Claimant reported that she had been out of treatment for one year, and her depression and anxiety began increasing in December 2015. (Tr. at 372). She began taking Vistaril prescribed by a provider in California, which decreased her anxiety. (*Id.*). However, she stated that her depression

and anxiety were severe over the past two weeks. (*Id.*). Mr. Kersey recommended a psychiatric evaluation. (Tr. at 376). Three days later, on April 9, 2016, Claimant was admitted to the CSU due to auditory hallucinations, flight of ideas, conceptual disorganization, guarded behavior, and paranoia. (Tr. at 470). Claimant was discharged on April 15, 2016 to receive community psychiatric supportive treatment. (Tr. at 472).

On April 27, 2016, Claimant presented to nurse practitioner, Toni L. Katona, to establish care with a primary care provider. (Tr. at 341). She did not have any acute complaints, denied having any psychological symptoms, and appeared alert and in no acute distress. (Tr. at 341, 343). Her current medications included: Celexa, Klonopin, Geodon, trazadone, and Vistaril. (Tr. at 341).

Thereafter, Claimant presented to Ira T. Webb, Jr., PA-C, at Southern Highlands approximately every four weeks from April through July 28, 2016 to receive treatment for her schizoaffective disorder, bipolar or depressive type; panic disorder; and agoraphobia. During every mental status examination, PA-C Webb noted that Claimant's speech, affect, and thought content were appropriate; mood was stable; insight/judgment and memory were good; stream of thought was normal; and cognitive functioning and energy were baseline. (Tr. at 363-70, 378-81, 408-37, 440-41). She did not have any hallucinations or suicidal or homicidal ideations, and she was cooperative, interacted well, and maintained direct eye contact. (*Id.*).

During her first visit with PA-C Webb on April 28, 2016 after her CSU admission, Claimant stated that she was "really doing well since discharge" and her medications were controlling her symptoms. (Tr. at 378). She was taking Geodon, Celexa, Klonopin, trazadone, and Vistaril. (*Id.*). Claimant told PA-C Webb on May 26, 2016 that she was

doing "ok," although she had a car wreck a few days earlier. (Tr. at 380). She flipped her car and totaled it, but she smiled and stated that she did not like to drive anyway. (*Id*.). She was not hurt in the accident. (*Id*.). On June 23, 2016, Claimant advised PA-C Webb that she was "feeling really good." (Tr. at 382). She had no issues with her medications; she was sleeping really well; and she did not have any psychosis. (Tr. at 382-83).

On July 21, 2016, Claimant told PA-C Webb that she was "doing much better," was fine on medications, and had no new issues. (Tr. at 363). Claimant advised PA-C Webb on August 18, 2016 that she was doing "ok," stating that she had "a new Dr interview for her SSI benefit" and she was nervous about it. (Tr. at 365). However, there were still no abnormalities in her mental status examination or changes to her diagnoses or treatment. (Tr. at 365-66). Claimant again advised PA-C Webb on October 13 and November 10, 2016 that she was doing "ok," but she noted that she was not sleeping well for which PA-C Webb added Remeron to her medication regimen. (Tr. at 367-70).

On January 6, 2017, Claimant reported to PA-C Webb that she was having some elevated moods and no psychosis or delusions, but she felt sedated a lot and sometimes slept too much, which PA-C Webb thought was due to Geodon. (Tr. at 408). He switched her medication to Risperdal. (*Id*.). Claimant told PA-C Webb on January 24, 2017 that she was doing better after the medication change, and her sleep issue was improved. (Tr. at 410). On February 22, 2017, Claimant advised PA-C Webb that she was "doing pretty good," and she did not have any hallucinations, delusions, or new issues. (Tr. at 412).

On March 22, 2017, Claimant advised PA-C Webb that she was feeling more depressed and not engaging in activities of daily living, such as washing dishes or bathing, and was also sometimes sleeping during the day. (Tr. at 414). PA-C Webb

13

encouraged better sleep habits and increased Claimant's dosage of Celexa. (*Id*.). Claimant told PA-C Webb on April 19, 2017 that she was doing better, and the medication change seemed to help some. (Tr. at 416). Claimant was much more talkative and more reactive during the appointment. (*Id*.). She stated that she was taking better care of herself and "doing things better." (*Id*.).

On May 17, 2017, PA-C Webb noted that Claimant was "doing pretty good," getting up more, and taking care of herself and her house. (Tr. at 418). On the same date, Claimant related to another staff member, Shelia Justus, at Southern Highlands that she believed her increased depression and anxiety was due to having financial problems and not being able to work. (Tr. at 394). On June 14, 2017, PA-C Webb recorded that Claimant's symptoms seemed well controlled. Claimant stated that she was doing better and brought her daughter with her to the appointment. (Tr. at 420).

On August 1, 2017, Claimant seemed a little apprehensive during her appointment with PA-C Webb, indicating that she missed her July session and had been out of medications for the past two weeks. (Tr. at 422). She admitted to seeing "violent things." (*Id*.). She did not want emergency intervention, but desired to get "back on meds." (*Id*.). PA-C Webb renewed her prescriptions. (Tr. at 423). However, Claimant was voluntarily admitted to the CSU from August 17 through 23, 2017 after she reported hallucinations that encouraged her to harm herself, as well as depression and anxiety. (Tr. at 475, 478).

Following that hospitalization, Claimant told PA-C Webb on September 12, 2017 that she was "doing really good" and her medications were helping. (Tr. at 424). She did not have any hallucinations or delusions, and she felt much better overall. (*Id*.). On

October 12, 2017, Claimant's daughter again accompanied her to her appointment. Claimant seemed to be doing well; her symptoms were well controlled, and she had no new stressors. (Tr. at 426). At her next monthly appointment on November 9, 2017, Claimant denied having any psychosis, but she stated that Vistaril was not really helping her anxiety, so PA-C Webb increased the dosage. (Tr. at 428). On December 11, 2017, Claimant told PA-C Webb that she was doing better and going to Connecticut to visit her brother and father. (Tr. at 430). She appeared excited. (*Id*.). Claimant returned to PA-C Webb on February 13, 2018, noting that she had a lot going on that month, but she was doing "pretty good" and had fun in Connecticut. (Tr. at 432). Claimant reported that Vistaril made her sick, so PA-C Webb discontinued it. (*Id*.).

On March 13, 2018, PA-C Webb recorded that Claimant was doing alright, but seemed "malodorous," and he encouraged Claimant to clean and bathe herself. (Tr. at 434). Claimant said that her home was clean, but she was "having problems" taking care of herself. (*Id*.). PA-C Webb noted that intervention might be necessary because she did not want Claimant to lose custody of her child to Child Protective Services. (*Id*.). Claimant was again admitted to the CSU from April 2 through 9, 2018 due to increased visions, hallucinations, and anxiety over the past two weeks. (Tr. at 458, 481). Her mental status examination was abnormal. (Tr. at 465). Claimant's dosage of Risperdal was increased, and she was approved for 24-hour outpatient community psychiatric support treatment services. (Tr. at 466, 468, 469).

Claimant followed up with PA-C Webb on April 26, 2018, reporting that she was doing better, she was not experiencing any hallucinations, and her symptoms seemed better controlled after the increase in Risperdal. (Tr. at 436). On June 7, 2018, she was

still doing "pretty good" without any new issues. (Tr. at 438). Claimant advised PA-C Webb that she had a disability hearing the next month. (*Id*.). On June 20, 2018, Claimant had a psychological evaluation at Southern Highlands after she did not take her medications for a few days and reported auditory and visual hallucinations. (Tr. at 448, 453). Claimant stated that she saw/heard four different individuals. The most prominent one looked like Claimant and depicted Claimant killing herself. (Tr. at 448). Another voice represented her conscious telling her to think rationally, and the other two voices were children, one of which was "good," and one was "bad." (*Id*.). Claimant was instructed to take her medications and participate in group and individual therapy, but was not admitted to the hospital. (Tr. at 456-57).

On July 10, 2018, Claimant told PA-C Webb that she was having some difficulty because her daughter went to stay with Claimant's mother for the summer. Claimant was nonetheless doing better, walking more, and trying to stay active. (Tr. at 440). As was the case throughout the foregoing treatment with PA-C Webb, Claimant's mental status examination was still normal. (Tr. at 440-41); *see* (Tr. at 363-70, 378-81, 408-37). Her speech, affect, and thought content were appropriate; mood was stable; insight/judgment and memory were good; stream of thought was normal; and cognitive functioning and energy were baseline. (Tr. at 440-41). She did not have any hallucinations or suicidal or homicidal ideations, and she was cooperative, interacted well, and maintained direct eye contact. (*Id*.).

### B. Opinion Evidence

On August 29, 2016, licensed psychologist, Kelly Robinson, M.A., performed a psychological examination of Claimant. Claimant related that she graduated from high

school and attended some college, but she did not complete her degree. (Tr. at 352-54). She was married; however, she and her husband had been separated since 2010. (Tr. at 355). Claimant's prior jobs included sign holder, pizza restaurant worker, housekeeper, and military worker. (Tr. at 356). She had two children, but one daughter died at the age of three weeks due to meningitis and stomach problems. (Tr. at 355). Her daily activities included some cleaning, using the computer, watching television, taking her medications, talking with her daughter, communicating with her boyfriend on Facebook messenger, and listening to music. (Tr. at 357). She took anxiety medication before seeing people, such as before going to the grocery store. (*Id.*). However, she spoke with a friend and her father on the telephone several times per week, communicated with friends on Facebook, walked to the grocery store by herself or with her boyfriend, and did laundry independently in her apartment complex. (*Id.*). Her hobbies included art and writing short stories, but she stated that she was "not very good at it." (*Id.*).

On examination, Claimant's mood was dysphoric with a mildly restricted affect; she reported paranoid thoughts and auditory hallucinations; her insight was fair; and her psychomotor behavior was characterized as "rocking at times." (Tr. at 355). Claimant was fully oriented; her thought processes were logical and coherent; she denied suicidal or homicidal ideation; and her immediate, recent, and remote memory, as well as her concentration, were within normal limits. (*Id.*). Claimant's full scale IQ score on the WAIS-IV was 95. (Tr. at 356). Her pace was slow during the test, but her concentration and persistence were normal. (Tr. at 358). Ms. Robinson recorded that she easily established and maintained rapport with Claimant. (Tr. at 356). Claimant was reserved during the examination, but cooperative. (*Id.*). Ms. Robinson noted that Claimant was

initially tense and anxious, but she gradually became more relaxed, and she recalled and understood directions, maintained a consistent effort during testing, was persistent and required little encouragement, and her speech was easy to understand. (*Id.*). Ms. Robinson diagnosed Claimant with bipolar schizophrenia and panic disorder with agoraphobia. (*Id.*).

On September 6, 2016, Jeff Boggess, Ph.D., performed a Psychiatric Review Technique based upon his review of Claimant's records. He found that Claimant's anxiety and affective disorders were severe impairments, but he assessed that there was insufficient evidence to evaluate her claim. (Tr. at 70-71). On February 18, 2017, Jeff Harlow, Ph.D., performed another Psychiatric Review Technique based upon his review of Claimant's records. He found that Claimant's depressive, bipolar, and related disorders and her anxiety and obsessive-compulsive disorders were non-severe impairments. (Tr. at 92). Dr. Harlow found insufficient evidence to substantiate the presence of schizophrenia spectrum or other psychotic disorders. (Tr. at 93). He concluded that Claimant had no limitation understanding, remembering, or applying information or adapting or managing herself, and she had mild limitation interacting with others and maintaining concentration, persistence, or pace. (Tr. at 93).

On January 22, 2018, PA-C Webb completed a Disability/Incapacity Medical Assessment form. (Tr. at 391). He noted that Claimant's diagnosis was schizophrenia and his last date of contact with Claimant was on December 11, 2017. (*Id.*). PA-C Webb stated that Claimant was not able to hold gainful employment, and that the length of time that her disability/incapacity was expected to last was ongoing. (*Id.*). However, he noted that Claimant did not require someone to stay in the home with her on a

continuous basis, and she remained able to care for children under the age of six years old. (*Id.*).

### C. Claimant's Statements

Claimant testified during her administrative hearing on July 30, 2018 that she had a driver's license, but she no longer drove because she hallucinated while driving and was also in a car crash that still affected her in the form of flashbacks. (Tr. at 39-40). Regarding her employment history, she stated that she was a supply specialist in the National Guard from 2006 until 2012, which required her to work one weekend per month. (Tr. at 42, 51). She testified that she left the National Guard because her "time was up," but she added that she was also starting to have more severe anxiety attacks. (Tr. at 42). Claimant stated that she did not have any other employment within the past 15 years because she was not good with people. (Tr. at 52). She alleged that she tried to get a job at McDonald's, but they did not hire her because she did not present well. (*Id.*).

Claimant testified that she started "hearing" and "seeing" things around high school, but she thought it was just caused by depression. (Tr. at 44). The problem worsened after the death of her daughter in 2010. (*Id.*). She said that was when her problems went from an "annoyance" to "a full blown like I can't function kind of thing." (Tr. at 52). She testified that she still hallucinated from time-to-time, and it made it hard to focus, but her medications minimized the severity and persistence of the symptoms. (Tr. at 45). Claimant stated that her treatment with PA-C Webb was beneficial, but she still had anxiety and did not like to leave her house. (*Id.*). She testified that she had anxiety attacks once or twice per month, but her depression was not as severe now due to medication. (Tr. at 46). Claimant claimed that her memory and concentration were

impaired, and she stated that she received "assertive community treatment," which facilitated her mental health care by providing rides, making sure that she received weekly group therapy, and helping her get out of the house more. (Tr. at 49). Claimant testified that she tried to write a book, but it took her five years to write four chapters because she could not focus. (Tr. at 56).

Claimant testified that her daily activities included caring for her nine-year-old daughter, who had always lived with Claimant except from May to December 2012. (Tr. at 54). Her daughter lived with the child's biological father for those seven months, because Claimant had just left the National Guard and there was a concern whether Claimant could provider for her daughter without a job. (Tr. at 55). However, Claimant stated that the issue was cleared up, and her daughter returned to her home. (*Id.*). Claimant supported herself and her daughter with welfare assistance and some financial assistance from family. (*Id.*).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642

(4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant challenges the ALJ's analysis of her treating therapist's opinion, in-patient hospitalizations, and agoraphobia. These arguments are considered below, in turn.

### A.   *Treating Opinion*

In her first challenge to the ALJ's decision, Claimant argues that the ALJ did not properly consider the opinion of her treating therapist, Ms. Brackins. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be

weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[2] *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's applications were filed in November 2016. Thus, the undersigned applied the law that governs her applications.

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement

on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, Claimant's treating therapist, Ms. Brackins, repeated the following statement several times in Claimant's clinical record: "Ct negative symptoms interfere with Ct ability to function at home, work and community." (Tr. at 20, 318, 319, 321, 324). The ALJ interpreted the statement to indicate that Claimant was negative for symptoms that interfered with her ability to function at home, work, and in the community. (Tr. at 19, 20). The ALJ noted that Ms. Brackins was Claimant's treating therapist while she lived in California, and he found that it was valuable evidence of Claimant's level of functioning during that period. (*Id.*). In addition, the ALJ found that the opinion was supported by the medical records and Ms. Brackins' examination of Claimant. (*Id.*). Therefore, the ALJ gave the opinion significant weight in the credibility and RFC analysis to show that Claimant did not have symptoms that interfered with her ability to function. (*Id.*).

Reviewing the record in this matter, the undersigned cannot conclude that the ALJ's interpretation of Ms. Brackins' opinion is supported by substantial evidence. First, examining the clinical notes immediately before Ms. Brackins initially rendered the

opinion, Claimant presented to Ms. Brackins for an Adult Clinical Assessment on July 23, 2013. Claimant related that she was previously diagnosed with schizophrenia, anxiety, and bipolar disorder. (Tr. at 330). She told Ms. Brackins that she wanted to physically assault individuals in the lobby and had the desire to consume human flesh. (*Id.*). Ms. Brackins specifically recorded that Claimant's mental illness impaired Claimant's ability to care for herself, work, and maintain interpersonal relationships. (*Id.*). Ms. Brackins cited that Claimant had difficulty grooming herself and managing her daily hygiene; reported having convulsions for five consecutive hours, as well as panic attacks, while in the Army National Guard; and Claimant isolated herself from family and social settings. (*Id.*). On examination, Claimant's mood was depressed; her affect was flat; her insight and judgment were poor-to-fair; she reported depersonalization, obsessions, and compulsions and auditory and visual hallucinations, stating that there were four different individuals present in her mind that spoke to her. (Tr. at 333). Her thought processes were tangential, overly detailed, and hard to follow, and she was distractible and unable to remember events before the age of 11 years old. (*Id.*).

Claimant failed to appear for her next appointment with Ms. Brackins on August 21, 2013, and Ms. Brackins recorded that Claimant was receiving services due to suicidal/homicidal ideation, auditory/visual hallucinations, and paranoia. (Tr. at 324). That was when Ms. Brackins first stated: "Ct negative symptoms interfere with Ct ability to ability to [sic] function at home, work, and community." (*Id.*). Claimant spoke with Ms. Brackins the following day. (Tr. at 323). She reported that she was hopeful about managing her mood after receiving medication assistance and moving out of her

mother's home. (*Id.*). Ms. Brackins encouraged Claimant to increase her engagement in activities that she previously enjoyed from zero times per day to four times per week. (*Id.*). She noted that she would assist Claimant with managing her current depressive symptoms. (*Id.*). Ms. Brackins followed up with Claimant six days later, on August 28, 2013. (Tr. at 322). She discussed with Claimant the benefits of taking medications to manage her "negative symptoms." (*Id.*). On September 9, 2013, Ms. Brackins recorded that she called Claimant for a status update and to schedule a therapy appointment, and Claimant reported feeling anxious about completing needed tasks, but her anxiety was reduced by the fact that she moved out of her mother's home and was living with a friend. (Tr. at 321). Claimant expressed that she would like to return to group therapy, but Ms. Brackins stated that they could discuss it once Claimant was compliant with her psychiatric medications. (*Id.*). Ms. Brackins again noted that Claimant was receiving services due to suicidal/homicidal ideation, auditory/visual hallucinations, and paranoia and wrote: "Ct negative symptoms interfere with Ct ability to ability to [sic] function at home, work, and community." (*Id.*).

Claimant failed to appear for her next appointment with Ms. Brackins on September 16, 2013. (Tr. at 320). Ms. Brackins again noted in Claimant's clinical record, on September 23, 2013, that Claimant was receiving services due to suicidal/homicidal ideation, auditory/visual hallucinations, and paranoia and she stated: "Ct negative symptoms interfere with Ct ability to ability to [sic] function at home, work, and community." (Tr. at 319). Ms. Brackins recorded that Claimant's present status was unknown, and Claimant had ten days to respond to Ms. Brackins' letter to determine if she was interested in continuing therapy or Claimant's treatment would be

discontinued. (*Id.*). On October 7, 2013, Ms. Brackins made the same case management note as September 23, except she added that Claimant did not respond to the letter and she discontinued Claimant's treatment. (Tr. at 318).

Nothing in the above records support the ALJ's interpretation that Ms. Brackins opined that Claimant was negative for symptoms that interfered with her ability to function at home, work, and in the community. In fact, the records clearly belie such a conclusion. Ms. Brackins specifically noted the ways in which Claimant's mental illness impaired her ability to maintain hygiene, caused convulsions and panic attacks at work, and led to self-isolation. (Tr. at 330). In addition, Claimant expressed disturbing symptoms, and Ms. Brackins documented a significantly abnormal mental status examination. (*Id.*). Subsequently, the day after Ms. Brackins again noted, "Ct negative symptoms interfere with Ct ability to ability to [sic] function at home, work, and community," she specifically stated that Claimant had "depressive symptoms present." (Tr. at 323, 324). Ms. Brackins again recorded six days later that Claimant had "depressive symptoms present," and she discussed with Claimant the benefits of taking medication to manage Claimant's "negative symptoms." (Tr. at 322). Therefore, Ms. Brackins' records suggest that when she used the term "negative," she meant "not desirable" rather than "the absence of." The remainder of Ms. Brackins' notes leave no ambiguity regarding her opinion that Claimant had symptoms that interfered with her ability to function, and there is no reasonable basis for the ALJ's interpretation to the contrary. It also bears mention that the ALJ considered Ms. Brackins' opinion in relation to the incorrect time period. The ALJ stated that the opinion was rendered in 2014, and he specifically considered it for that time frame, but the opinion was contained in clinical

records dated in 2013. (Tr. at 19, 20, 318, 319, 321, 324). Thus, the ALJ not only misconstrued the substance of Ms. Brackins' opinion, but the time period that it concerned as well. In this instance, the time period has relevance given that Claimant was insured for DIB through March 14, 2014.

Moreover, the ALJ's erroneous analysis of Ms. Brackins' opinion is not harmless, because the ALJ explicitly afforded it significant weight in assessing Claimant's credibility and RFC. (Tr. at 19, 20). The ALJ's interpretation of Ms. Brackins' opinion therefore directly impacted the ALJ's ultimate determination that Claimant was not disabled. Thus, because the ALJ's analysis of Ms. Brackins' opinion was without reasonable basis, and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine Ms. Brackins' opinion.

### B.    *In-Patient Hospitalizations*

An exhaustive discussion of Claimant's other challenges is not necessary given the fact that the undersigned recommends that the decision be reversed and remanded to the Commissioner. However, the undersigned briefly addresses Claimant's second argument that the ALJ did not consider her four in-patient hospitalizations.

A review of the decision demonstrates that this evidence was properly considered. The ALJ discussed that, although Claimant did not receive treatment for one year during the relevant period, she did not decompensate to the point of requiring hospitalization. (Tr. at 18, 19). The ALJ explained that Claimant's other brief increases in symptoms were

corrected through medication management. (*Id.*). The ALJ discussed that Claimant's delusions appeared when she did not take medication, and they dissipated when she resumed taking it. (*Id.*).

The ALJ's foregoing analysis is supported by substantial evidence. The record reflects that Claimant was voluntarily hospitalized in November 2011 for seven days, April 2016 for six days, August 2017 for six days, and April 2018 for seven days due to reported hallucinations and other symptoms. (Tr. at 332, 458, 470, 472, 475, 478, 481). However, there was an extended period of time, including one year that Claimant was not even receiving treatment, that Claimant was not hospitalized after the 2011 admission. Further, after her 2016, 2017, and 2018 hospitalizations, Claimant very clearly reported that her medications were effectively controlling her symptoms, she denied hallucinations, stated that she was doing well, and had entirely normal mental status examinations with the exception of some reported sleep difficulty, which she said improved. (Tr. at 341-43, 378-79, 424-41). Claimant's speech, affect, and thought content were appropriate; mood was stable; insight/judgment and memory were good; stream of thought was normal; and cognitive functioning and energy were baseline. (Tr. at 378-79, 424-41). She did not have any hallucinations or suicidal or homicidal ideations, and she was cooperative, interacted well, and maintained direct eye contact. (*Id.*).

Contrary to Claimant's assertion, the ALJ explicitly considered Claimant's brief exacerbations of symptoms, and he thoroughly discussed and cited Claimant's treatment records to support his finding that her increases in symptoms were temporary and controlled with adjustments to her medications. While the ALJ may not have specifically

referred to the exacerbations as "hospitalizations," the ALJ clearly considered the relevant evidence. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's analysis of Claimant's in-patient hospitalizations.

### C.    *Agoraphobia*

Finally, Claimant contends that the ALJ did not discuss the functional impact of her agoraphobia or assess RFC limitations related to it. She suggests that the condition impacted her persistence and pace, and it would also potentially cause her to be absent from work. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either

overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ performed the special technique at step two of the sequential evaluation to assess the degree of Claimant's mental functional limitations. As relevant to this challenge, the ALJ concluded that Claimant's ability to interact with others was moderately limited. (Tr. at 17). However, the ALJ discussed that, despite Claimant's social anxiety, Claimant cared for her daughter; she had stable relationships with friends, even living with a friend during part of the relevant period; she traveled to Connecticut to visit her father and brother in December 2017 and stated that she had fun; and she was consistently cooperative with medical providers. (*Id.*). The ALJ likewise found that Claimant was moderately limited in maintaining concentration,

persistence, or pace. (*Id.*). The ALJ considered Claimant's reported hallucinations, but he noted that they occurred when Claimant was not properly medicated. (*Id.*). In the RFC discussion, the ALJ cited Claimant's allegations that she could not work with people, was paranoid that others were talking about her, and that her impairments impacted her relationships. (Tr. at 19). The ALJ noted that Claimant was diagnosed with schizoaffective disorder and panic disorder with agoraphobia. (*Id.*). He discussed Claimant's treatment records and the opinion evidence and ultimately concluded that Claimant could interact socially, but she had a limited ability to interact with others because it caused stress and potentially triggered panic attacks. (Tr. at 19-20). The ALJ restricted Claimant's RFC to occasional interaction with supervisors and co-workers and no contact with the public except for incidental contact. (Tr. at 18). Further, the ALJ assessed that Claimant could work around others, but needed to work "more off by herself." (*Id.*).

Based on the above, there is simply no merit to Claimant's contention that the ALJ failed to consider the functional impact of her agoraphobia. The ALJ considered Claimant's social limitations and assessed specific RFC restrictions to account for them. Moreover, Claimant does not identify, nor the undersigned find, any evidence that the ALJ overlooked indicating that the impairment caused greater RFC restrictions than the ALJ found. Claimant suggests that her agoraphobia more severely affected her concentration and potentially caused absenteeism from work, but she does not point to any evidence to support such conclusion. The ALJ considered all of the evidence and assessed RFC restrictions that he determined would account for Claimant's agoraphobia. Therefore, the undersigned **FINDS** that substantial evidence supports the

ALJ's RFC analysis regarding Claimant's agoraphobia.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 13, 14), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir.

1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 13, 2020

Cheryl A. Eifert
United States Magistrate Judge